Monica S. Call (#11361)
monica.call@stoel.com
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

William D. Kloss, Jr. (*pro hac vice*
application forthcoming)
wdklossjr@vorys.com
Rodney A. Holaday (*pro hac vice* application
forthcoming)
raholaday@vorys.com
Arryn K. Miner (*pro hac vice* application
forthcoming)
akminer@vorys.com
VORYS, SATER, SEYMOUR AND PEASE LLP
52 E. Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
Telephone: (614) 464-6400
Facsimile: (614) 719-6350

Marcel C. Duhamel (*pro hac vice* application
forthcoming)
mcduhamel@vorys.com
VORYS, SATER, SEYMOUR AND PEASE LLP
200 Public Square, Suite 1400
Cleveland, OH 44114
Telephone:  (216) 479-6100
Facsimile:  216-479-6060

*Attorneys for Plaintiff Skullcandy, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SKULLCANDY, INC., a Delaware Corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>IRENA STERLING, doing business as "Loop Savings" and JOHN DOES 1-100,<br><br>　　　　　Defendants. | **COMPLAINT**<br><br>**JURY DEMANDED**<br><br> Case No: |

Plaintiff Skullcandy, Inc., ("Skullcandy") brings this action against Defendants Irena Sterling ("Sterling") and John Does 1-100 ("Doe Defendants") (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); common law trademark infringement; common law unfair competition; deceptive trade practices in violation of Utah Code Ann. § 13-11a-3; unfair competition in violation of Utah Code Ann. § 13-5a-102; and tortious interference with contract and business relations, and alleges as follows.  These claims arise out of Defendants' misappropriation of Skullcandy's trademarks in conjunction with Defendants' unlawful and unauthorized sale of Skullcandy®-brand products on the Internet, including the sale of materially different and non-genuine products bearing Skullcandy's trademarks that are not subject to, do not abide by, and interfere with Skullcandy's quality controls.

## PARTIES

1.      Plaintiff Skullcandy is a Delaware corporation with its principal place of business located in Park City, Utah.

2.      Upon information and belief, Defendant Sterling is an individual, who resides in Staten Island, New York, and does business as the storefront "Loop Savings" on www.amazon.com ("Amazon").

3.      The true names, involvement, and capacities, whether individual, corporate, associated or otherwise of the Doe Defendants are unknown to Skullcandy.   Therefore, Skullcandy sues these Defendants by a fictitious name.  Skullcandy is informed and believes, and on that basis alleges, that the Doe Defendants sued herein are equally responsible for the events

-2-

and occurrences referred to herein or otherwise interested in the outcome of the dispute. When the true names, involvement, and capacities of these parties are ascertained, Skullcandy will seek leave to amend this Complaint accordingly.

## JURISDICTION

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338 for Skullcandy's claims that arise under federal law and 28 U.S.C. § 1367 for Skullcandy's claims that arise under state law because they form part of the same case or controversy as Skullcandy's claims that arise under federal law.

5.      This Court has personal jurisdiction under the Due Process Clause because Defendants have expressly aimed tortious activities toward the State of Utah and established sufficient minimum contacts with Utah by, among other things, advertising and selling infringing Skullcandy products to consumers within Utah through one or more highly interactive commercial websites with the knowledge that Skullcandy is located in Utah and their actions would likely injure Skullcandy in Utah. Defendants have (1) transacted business in Utah; (2) contracted to supply products in Utah; (3) shipped merchandise directly or indirectly into or through Utah; (4) caused harm or tortious injury by acts or omissions in Utah; and (5) caused harm or tortious injury to Skullcandy by acts or omissions outside of Utah.

6.      Defendants have created an interactive online storefront on Amazon called "Loop Savings." Through this interactive storefront, Defendants actively advertise, market, sell, ship, and distribute infringing products bearing Skullcandy's trademarks in Utah and to Utah residents. Defendants continue to engage in these actions despite being put on notice of their illegal conduct and the impendency of this action.

7.     Defendants' activities in Utah have been significant and they have made substantial and regular sales of infringing products bearing Skullcandy's trademarks to Utah. Defendants have sold, and continue to regularly sell, additional infringing products bearing Skullcandy's trademarks into Utah and to Utah residents.

## VENUE

8.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Skullcandy's claims occurred within this judicial district or, in the alternative, because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Skullcandy and Its Trademarks

9.     Skullcandy develops, manufactures, markets, and sells headphones and speakers. Skullcandy sells its products through its own website and its network of authorized distributors, retailers, and resellers ("Authorized Dealers").

10.    Skullcandy devotes a significant amount of time, energy, and resources toward protecting the value of its brand, products, name, and reputation.  By distributing products exclusively through its own website and its Authorized Dealers, Skullcandy is able to ensure the satisfaction of consumers and maintain the integrity and reputation of the Skullcandy brand.  In the highly competitive audio electronics market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

11.    To promote and protect the Skullcandy brand, Skullcandy has registered numerous trademarks with the United States Patent and Trademark Office with respect to its

-4-

brand and products, including but are not limited to, SKULLCANDY® (U.S. Trademark Registration Nos. 3,381,050, 3,726,304, 3,788,707, 3,880,588, 3,168,695, 4,396,791, 4,622,094, 4,724,445, 5,166,615, and 5,215,305), METHOD® (U.S. Trademark Registration No. 4,800,154), RIFF® (U.S. Trademark Registration No. 4,597,589), GRIND® (U.S. Trademark Registration No. 4,813,598), KNOCKOUT® (U.S. Trademark Registration No. 4,709,260), BARRICADE® (U.S. Trademark Registration No. 5,120,775), SMOKIN' BUDS® (U.S. Trademark Reg. No. 4,695,063); STRUM® (U.S. Trademark Reg. No. 4,875,460); and STIM® (U.S. Trademark Reg. No. 5,308,334) (collectively, the "Skullcandy Trademarks").

12.     The registration for each of the Skullcandy Trademarks is valid, subsisting, and in full force and effect.

13.     Skullcandy filed the SKULLCANDY® trademark on January 10, 2006, and it was registered on November 7, 2006.  Skullcandy has actively used the SKULLCANDY® trademark since that time.

14.     Skullcandy actively uses, advertises, and markets all of the Skullcandy Trademarks in commerce throughout the United States.

15.     Skullcandy was founded in 2003 and has advertised, promoted, and sold products in interstate commerce under the Skullcandy name and trademark since that time.  Examples of the types of products sold under the Skullcandy name and trademark are depicted below:





CRUSHER WIRELESS HEADPHONE
$199.99

HESH 3 WIRELESS HEADPHONE
$129.99

HESH 2 WIRELESS HEADPHONE
$99.99

16.     Consumers recognize the Skullcandy Trademarks as being associated with high quality headphones and speakers in the audio electronics market.

17.     Consumers associate the Skullcandy Trademarks with the quality and innovation of Skullcandy's products, which have been remarkably consistent and dependable since the company's founding in 2003.  For the past 15 years and counting, Skullcandy has committed to taking all reasonable measures to guarantee high quality, innovative, and long-lasting products.

18.     The Skullcandy name is also well known for its commitment to counterculture and self-expression, as the Skullcandy brand lives at the intersection of sport, music, youth culture, art, film and fashion.

19.     In 2008, Fortune Magazine praised Skullcandy products as "the world's coolest ear bud."  See Michael Copeland, The world's coolest ear buds, Fortune Magazine (Dec. 8, 2008), http://archive.fortune.com/2008/12/30/technology/copeland_skullcandy.fortune/index.htm.

20.     For all of these reasons, the Skullcandy Trademarks are widely recognized by the general public of the United States, and Skullcandy is widely recognized as the source of products bearing the Skullcandy Trademarks.

-6-

21.     Due to the superior quality and exclusive distribution of Skullcandy products, and because Skullcandy is uniquely recognized as the source of these high quality products, the Skullcandy Trademarks have enormous value.

**Online Marketplaces and the Challenges They Present to Skullcandy Product Quality**

22.     E-commerce retail sales have exploded over the past decade.  From 2007 to 2018, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.1% to 9.1%.  *See* Stefany Zaroban, *U.S. e-commerce sales grow 16.0% in 2017*, DIGITAL COMMERCE 360 (Feb. 16, 2018) https://www.digitalcommerce360.com/2017/02/17/us-e-commerce-sales-grow-156-2016/;     E-Commerce Retail Sales as a Percent of Total Sales, FEDERAL RESERVE BANK OF ST. LOUIS (May 17, 2018), https://fred.stlouisfed.org/series/ECOMPCTSA.

23.     In 2017, consumers spent $453.46 billion on e-commerce sales, a 16% increase from 2016.  *Id.*  The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2017 United States consumers spent $189.6 billion in e-commerce sales on Amazon, a 30.1% increase from 2016.  *Id.*

24.     While the online marketplaces have created a great deal of opportunity, they also greatly challenge a manufacturer's ability to control the quality of its products.

25.     For example, consumers who purchase products through the online marketplaces cannot touch, inspect, or interact with the product before purchasing it and cannot select a different product if the one they initially select is damaged or has been tampered with.  Instead, consumers must trust that the product they choose over the Internet will arrive and be of the quality they expect and typically receive from the manufacturer.

26.     The online marketplaces also allow third parties to sell products anonymously, i.e., without disclosing their actual identity or sources to consumers.  As such, any person who is able to obtain a manufacturer's products through unauthorized diversion can sell them on the online marketplaces without having to reveal his/her identity to the consuming public.  This effectively prevents the manufacturer and the consumer from being able to reach sellers, like Defendants, and address quality concerns.

27.     It is common for these unauthorized sellers to sell diverted products well past their expiration date or to mix fake or diluted products in shipments to unwitting consumers.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the 'gray market'*, (Sept. 8, 2016),   https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html.  Indeed, there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and assume that the products they are buying through the marketplaces are genuine.   *See* Spencer Soper, *Amazon Gets Real About Fakes* (Nov. 28. 2016), https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes.

28.     In its 2018 annual report to its shareholders, in fact, Amazon admitted that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), available at https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x10k.htm.  Amazon conceded that these actions are "violating the proprietary rights of

others," and warned its investors that Amazon "could be liable for fraudulent or unlawful activities" of Amazon third party sellers.

29.     Because diverters, like Defendants, operate anonymously on marketplaces and undertake great measures to maintain anonymity, manufacturers have no ability to exercise their quality controls over the products sold by diverters.

30.     Online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity because their construction and user interface suggest that all sellers on the marketplaces are all selling the same product when – as is the case here – they are not.

31.     When purchasing product on a marketplace, customers cannot easily distinguish between a manufacturer's authorized and unauthorized sellers.  Indeed, on some marketplaces, all sellers are listed under one product listing, making it practically impossible for consumers to ascertain which sellers are authorized and subject to the brand's quality standards and which are selling unauthorized products outside of the manufacturer's quality controls.  Unlike brick-and-mortar channels where a consumer can simply select another product from the shelf where the initial product selected appears to be of compromised quality, e-commerce consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality. This reality requires that brands implement unique quality control programs into their e-commerce channels to protect their goodwill and consumers.

32.     It is widely understood that when a customer purchases a product on an online marketplace and receives a damaged, defective, expired, or poor quality product, the customer is

much more likely to associate that problem with the brand/manufacturer than the anonymous seller.

33.    The online marketplaces give disgruntled customers a powerful and convenient forum to air their grievances about problem products – online product reviews.  Any consumer who is dissatisfied with a product he/she receives can post a review on the marketplace for all other consumers to see.  These reviews, which are often permanently fixed, will often criticize the brand/manufacturer of a product rather than the marketplace seller that sold the product.

34.    It is widely accepted that product reviews on the online marketplaces have a significant impact on a brand's reputation.  Survey results show that 82% of United States adults sometimes consult online reviews for information when they consider buying a new product online and 40% "always" or "almost always" consult such reviews.  *See Online Shopping and E-Commerce: 2. Online reviews*, PEW RESEARCH CENTER (Dec. 19, 2016) http://www.pewinternet.org/2016/12/19/online-reviews/.

35.    Consumers place extraordinary trust in these online reviews.  Indeed, consumers are over 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  *See Moms Place Trust in Other Consumers*, EMARKETER (Feb. 10, 2010), https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.  Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, *FTC cracking down on fake Amazon reviews*, Fox Business, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

-10-

36.     Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings.  According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product.  *See* Graham Charlton, *How many bad reviews does it take to deter shoppers?* (Apr. 12, 2011), https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

37.     Negative reviews may also hurt a brand's product placement in search results, further reducing the likelihood that customers will purchase the products.

### Skullcandy Has Been the Target of Negative Online Marketplace Reviews from Customers Who Purchased Products Bearing the Skullcandy Trademarks from Unauthorized Sellers like Defendants

38.     Brands are often victims of anonymous, unauthorized sellers on online marketplaces who cause consumers to post negative reviews that injure brands' goodwill and reputation.  Skullcandy has been the subject of negative online-marketplace reviews from customers who purchased products from sellers, like Defendants, that did not abide by the quality controls that Skullcandy requires Authorized Dealers to follow.

39.     For example, on May 10, 2017, a Loop Savings customer, Tristan Ballard, complained that he received a fake product: "Item was open when received. Not wrapped in cellophane and not new as described.  The white headphone case is not the original but a knockoff.  Do not buy."

⭐☆☆☆☆  *"Item was open when received. Not wrapped in cellophane and not new as described. The white headphone case is not the original but a knockoff. Do not buy."*

By Tristan Bullard on May 10, 2017.

40.     On June 22, 2017, another customer, Thom, complained that he received a defective product and the seller was unresponsive: "Item defective upon arrival, seller unresponsive."

⭐⭐☆☆☆   *"Item defective upon arrival, seller unresponsive"*

By Thom on June 22, 2017.

41.     On August 30, 2017, another customer, Tracy Staines, was very disappointed when the packaging was damaged when the product arrived: "The box arrived all broken and had clearly been opened previously as both clear tabs top and bottom were undone.  It was also ripped across the front.  The damages to the box was not done in transit.  As this was a present I was very disappointed with the quality of the packaging.  If it had been in a shop I would not have bought it."

⭐☆☆☆☆   *"The box arrived all broken and had clearly been opened previously as both clear tabs top and bottom were undone. It was also ripped across the front. The damage to the box was not done in transit. As this was a present I was very disappointed with the quality of the packaging. If it had been in a shop I would not have bought it"*
Read less

By Tracy Staines on August 30, 2017.

42.     On September 8, 2017, another customer, Mary Greathouse, complained that she received a defective product and the seller was unresponsive: "Arrived with a defective battery. Contacted seller and they did not respond."

⭐☆☆☆☆   *"Arrived with a defective battery. Contacted seller and they did not respond."*

By Mary Greathouse on September 8, 2017.

43.     On October 7, 2017, another customer, G. Deeth, complained of receiving an open package: "Item received was opened and the seal broken when I purchased 'new.'"

-12-

⭐☆☆☆☆   "Item received was opened and the seal broken when I purchased "new" "

By G. Deeth on October 7, 2017.

44.     On November 15, 2017, another customer complained that the seller provided a

false product description: "False product description states in FOUR separate places that the

product comes with a wall charger, which it did not (my guess is that an older model included a

charger, but not the newer one being sold to me).  I contacted this seller for options; it's been 30

days no with no reply."

⭐⭐☆☆☆   "False product description states in FOUR separate places that the product comes with a wall charger,
which it did not (my guess is that an older model included a charger, but not the newer one being sold to
me). I contacted this seller for options; it's been 30 days now with no reply. "
Read less

By Anonymous on November 15, 2017.

45.     On March 2, 2018, another customer, Jeffrey Huen, complained that he received a

defective item: "[D]efective item.  [D]oesn't even pair with my mac or pc."

⭐☆☆☆☆   "defective item. doesn't even pair with with my mac or pc. "

By Jeffrey Huen on March 2, 2018.

46.     On March 12, 2018, another customer, Sonya Campbell complained that the

product      she      received      was      inoperable:      "Item      did      not      work."

⭐☆☆☆☆   "Item did not work "

By Sonya Campbell on March 12, 2018.

47.     On July 17, 2018, another customer, S Brown, complained that they received a

used product: "Returned item.  Bought new but item was clearly used."

-13-



*"Returned item. Bought new but item was clearly used."*

By S Brown on July 17, 2018.

48.     On November 29, 2018, another customer complained that he received a poor quality product: "[T]hey sent me used broken headphones."

*"they sent me used broken headphones"*

By Amazon Customer on November 29, 2018.

49.     Upon information and belief, the foregoing complaints were made by consumers who purchased Skullcandy products from Defendants through the Loop Savings storefront.

### Skullcandy Has Implemented Strict Quality Controls to Combat the Problems Presented by the Online Marketplaces and Protect the Value of the Skullcandy Trademarks

50.     Recognizing the reputational concerns associated with the illegal sale of Skullcandy products by unauthorized sellers, like Defendants, who do not abide by Skullcandy's quality controls and peddle poor quality products to unsuspecting consumers, Skullcandy has implemented a quality control program that applies to both brick and mortar retail settings and online sellers to protect the value and goodwill associated with the Skullcandy brand.

51.     The goal of Skullcandy's quality control program is to ensure that consumers who buy Skullcandy products online receive products that feature all of the special characteristics that consumers have come to expect from products sold under the Skullcandy name.

52.     The program seeks to minimize the likelihood that poor quality products will reach consumers.  By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Skullcandy brand.

-14-

53.     Skullcandy abides by its quality control requirements and requires its Authorized Dealers to abide by them as well.

54.     Skullcandy's ability to exercise its quality controls is essential to the integrity and quality of Skullcandy products, as well as the value of the Skullcandy Trademarks and other intellectual property.

### Authorized Dealers are Required to Adhere to Skullcandy's Quality Control and Customer Service Requirements

55.     Skullcandy maintains its strict quality controls over Skullcandy products by ensuring consumers receive Skullcandy products purchased from Skullcandy or an Authorized Dealer.

56.     Authorized Retailers are permitted to sell Skullcandy products only in approved channels and are required to abide by Skullcandy's policies and other sales practices (collectively, the "Skullcandy Rules").

57.     Authorized Dealers are permitted to sell Skullcandy products only to Authorized Retailers.  Skullcandy's policies define an "Authorized Retailer" as an individual or business that: (1) Skullcandy has approved as a seller of Skullcandy products; (2) purchases and resells products as part of an commercial enterprise, and is not an End User of Skullcandy products; (3) has agreed to follow the Skullcandy Rules; and (4) has not had its Authorized Retailer status revoked by Skullcandy.

58.     Authorized Retailers are permitted to sell Skullcandy products only to End Users. The Skullcandy Rules define an "End User" as a purchaser of Skullcandy Products who is the ultimate consumer of the products and who does not intend to resell the products to a third party.

Authorized Retailers are strictly prohibited from selling Skullcandy products to any person or entity the Retailer knows or has reason to know intends to resell the products.

59.     Authorized Retailers are permitted to sell Skullcandy products to End Users on the Internet only if the products are sold on Permissible Websites.  Among other requirements, the Skullcandy Rules require that "Permissible Websites": (1) be operated by an Authorized Retailer in the Retailer's legal name or registered fictitious name; (2) conspicuously state the Retailer's legal name, mailing address, telephone number, and email address (i.e., Authorized Retailers cannot sell products anonymously); (3) not use any third-party fulfillment service to store products or fulfill product orders, such that customers could receive products that did not come from the Authorized Retailer's inventory; (4) use only images of Skullcandy products that were supplied by or authorized by Skullcandy and keep all product descriptions accurate and up to date; and (5) comply with various privacy, accessibility, and data security laws, regulations, and industry standards.

60.     All Authorized Dealers (Authorized Distributors and Authorized Retailers) are prohibited from selling Skullcandy products on any third-party online marketplace—such as Amazon, www.ebay.com, www.walmart.com, and www.jet.com—without Skullcandy's prior written consent.

61.     The purposes of these restrictions are to ensure that Skullcandy knows who its Authorized Dealers are, which ones are selling online and where they are selling online, and how to immediately contact them in the event of any product quality issues.

62.     The Skullcandy Rules also require Authorized Dealers to adhere to Skullcandy's quality control requirements.

63.     To ensure that customers receive the genuine and high-quality products they expect from Skullcandy products, the Skullcandy Rules require that Authorized Dealers inspect all products for damages, defects, and other non-conformance and remove all such products from inventory. Further, to assist Skullcandy in identifying any product quality issues, Authorized Dealers are required to report any defects to Skullcandy.

64.     The Skullcandy Rules also require that Authorized Dealers store products in accordance with guidelines issued by Skullcandy.

65.     To avoid consumer confusion and ensure that customers receive genuine Skullcandy products, Authorized Dealers are prohibited from relabeling, repackaging, or altering Skullcandy products. Authorized Dealers are also prohibited from removing, translating, or modifying the contents of any label or literature on or accompanying Skullcandy products. Further, Authorized Dealers are prohibited from tampering with, defacing, or otherwise altering any identifying information on Skullcandy products, including lot codes, batch codes, and serial numbers.

66.     Skullcandy also ensures that consumers receive safe products by requiring that Authorized Dealers assist with recalls and other consumer safety information efforts. To allow it to conduct recalls and disseminate other warnings about its products, Skullcandy places serial numbers on many of its products. Through these serial numbers, Skullcandy can communicate with its Authorized Dealers and alert them if specific products ever need to be recalled or receive other attention. The serial numbers also allow Skullcandy to determine which Authorized Dealer a specific product was sold to when a customer complains of poor quality and provides a product bearing a serial number.

67.     The Skullcandy Rules also require that Authorized Dealers provide certain services to their customers.  For example, Authorized Retailers must familiarize themselves with the features of all Skullcandy products kept in their inventory.  This requirement ensures that Authorized Retailers are uniquely qualified not only to recommend the Skullcandy products best suited for End User consumers' needs and well-being, but also to advise End User consumers on how to use Skullcandy products safely and properly.

68.     Following the sale of genuine Skullcandy products, Authorized Retailers provide ongoing support to End User consumers and are required to provide expeditious customer service by responding promptly to consumer inquiries.

69.     Unless otherwise approved by Skullcandy in writing, Authorized Dealers selling on Permissible Public Websites may not use any third-party fulfilment service to store inventory or fulfill orders for Skullcandy products.  This requirement ensures that Skullcandy can quickly investigate and address any quality-control or customer-service issues related to order fulfillment.

70.     If Skullcandy learns that an Authorized Dealer is selling Skullcandy products of poor quality or is otherwise not adhering to Skullcandy's quality controls, Skullcandy conducts investigations to determine the source of the problem.  The Skullcandy Rules require that Authorized Dealers cooperate with Skullcandy's investigation and disclose all information about where they obtained Skullcandy products.  Based on what its investigation reveals, Skullcandy has the right to cease selling its products to Authorized Dealers and to terminate their status as Authorized Dealers.

102431141.2 0203478-00001

71.     Skullcandy's quality control requirements are legitimate, substantial, and non-pretextual and have been implemented so that Skullcandy can control the quality of goods manufactured and sold under the Skullcandy Trademarks, which protects consumers and the value and goodwill associated with the Skullcandy Trademarks.

72.     Skullcandy's quality control requirements are also material because they are designed to protect consumers and prevent them from receiving poor quality products that could harm them or cause harm to Skullcandy's reputation and goodwill.

73.     Consumers consider it material and relevant to their purchasing decision to know whether a Skullcandy product is being sold by an Authorized Dealer that is subject to Skullcandy's quality control requirements or whether it is being sold by an unauthorized seller that is not subject to and does not abide by Skullcandy's quality controls and over whom Skullcandy is unable to exercise its quality controls.

**Genuine Skullcandy Products Come with a Warranty; Defendants' Products Do Not**

74.     Skullcandy provides a two-year limited manufacturer's warranty (the "Skullcandy Warranty") for all products sold to End Users by Authorized Retailers.

75.     The Skullcandy Warranty provides that, if "at the time of purchase [a product] contained a manufacturing defect or had been damaged by improper care prior to the time of purchase, then Skullcandy in its sole discretion, will (i) repair, (ii) replace, or (iii) provide a Warranty Credit for the product for use on the Skullcandy online store."   The complete Skullcandy Warranty statements can be viewed on the Skullcandy website.   *See Official Skullcandy Warranty Policy ("Warranty Policy"), available at*

https://info.skullcandy.com/Support?Dest=hc%2Fen-us%2Farticles%2F360008551494-Warranty-Policy.  Such statements are incorporated herein.

76.     As discussed above, Skullcandy cannot ensure the quality of the products sold by unauthorized sellers, like Defendants, who are not subject to Skullcandy's control.  For this reason, the Skullcandy Warranty is not available for Skullcandy products sold by unauthorized sellers, like Defendants, who do not comply with Skullcandy's quality controls and standards.  Indeed, the Skullcandy Warranty specifically states: "Skullcandy's warranty extends only to products purchased from authorized sellers that are subject to Skullcandy's quality controls and have agreed to follow its quality controls."

77.     The Skullcandy Warranty is a material element of genuine Skullcandy products.  Consumers purchasing Skullcandy products would find it material and relevant to their purchasing decision to know whether the product they are purchasing is covered by the Skullcandy Warranty.  If a consumer knew a product did not come with the Warranty, the consumer would be less likely to purchase the product.

**Defendants Do Not Abide by Skullcandy's Quality Controls
and Customer Service Requirements**

78.     Defendants do not abide by Skullcandy's quality control measures that are imposed upon Authorized Dealers.

79.     Defendants do not comply with Skullcandy's quality control requirements because they have not provided Skullcandy their business information or given Skullcandy an opportunity to vet them to determine if they meet Skullcandy's high level of standards that it demands of its Authorized Dealers.

80.     Defendants do not comply with Skullcandy's quality control requirements because they sell products on their Amazon storefront anonymously.  Defendants' storefront page does not include their business name, mailing address, or email address, or any other contact information.  In fact, as discussed in greater detail below, Defendants undertake great efforts to maintain anonymity and prevent anyone from contacting them regarding their business and poor-quality products they sell to unwitting consumers.  Defendants' concerted efforts at maintaining anonymity prevents Skullcandy from addressing any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Skullcandy Trademarks, such as the complaints discussed above.

81.     Defendants also do not comply with Skullcandy's quality control requirements because they have not disclosed to Skullcandy where they acquire products that bear the Skullcandy Trademarks.  Accordingly, Skullcandy cannot determine if any products sold by Defendants are subject to a recall.

82.     Defendants do not comply with Skullcandy's quality control requirements with respect to inventory because, upon information and belief, Defendants do not inspect the products they sell for damage, defects, evidence of tampering, and other non-conformance and remove all such products from inventory.  Instead, upon information and belief, Defendants sell products bearing the Skullcandy Trademarks that are damaged.

83.     Defendants do not comply with Skullcandy's quality control fulfillment requirements because, on information and belief, they store their products at Amazon warehouses, they allow their inventory stored at Amazon's warehouses to be commingled with other sellers' inventory, and/or they keep no product inventory at all and solely order Skullcandy

products from other online storefronts after customers purchase products from Defendants' Amazon storefront.   As a result, even if Defendants were to implement quality-assurance procedures comparable to those that Skullcandy requires of Authorized Dealers, customers would not receive products that abide by those quality controls when purchasing Skullcandy products from Defendants.

84.     Defendants do not comply with Skullcandy's quality control requirements because, upon information and belief, they sell products as "new" that have been opened, returned and/or repackaged.   Upon information and belief, Defendants allow products that are returned to Amazon to be repackaged and placed back in their inventory as "new" products. This results in consumers, who believe they are purchasing new Skullcandy products, actually receiving returned products of inferior quality.

85.     Upon information and belief, Defendants do not comply with Skullcandy's quality control requirements related to the handling, packaging, and shipping of products because Defendants sell products bearing the Skullcandy Trademarks that arrive damaged or defective.

86.     Defendants' failure to abide by the Skullcandy Rules prevents Skullcandy from exercising control over the quality of products Defendants sell bearing the Skullcandy Trademarks.   Skullcandy cannot audit Defendants to ensure they are complying with Skullcandy's quality controls and/or close Defendants' account for failing to comply with Skullcandy's quality control requirements.

87.     Defendants' failure to comply with the Skullcandy Rules also interferes with Skullcandy's quality controls because Skullcandy cannot obtain Defendants' assistance with any

recall or consumer safety information efforts that may arise with respect to products sold by Defendants.

88.     Defendants also do not comply with Skullcandy's customer service requirements because they are not qualified nor have they been by Skullcandy to accurately describe, demonstrate, and sell the products in their inventory and to advise customers on the safe and proper use of Skullcandy products.

89.     Defendants also do not comply with Skullcandy's customer service requirements because they do not, and are unable to, provide the advice to consumers that Skullcandy requires of its Authorized Dealers and do not provide the type of ongoing support and response to consumer inquiries that Skullcandy requires of its Authorized Dealers.

90.     Defendants do not comply with Skullcandy's customer service requirements because they do not take appropriate steps to address negative reviews from customers and do not cooperate with Skullcandy in investigating negative product reviews.

**Defendants Are Infringing on the Skullcandy Trademarks by Selling Products Bearing the Skullcandy Trademarks That Are Not Subject to, Do Not Abide By, and Interfere with Skullcandy's Quality Controls and Customer Service Requirements**

91.     For all of the reasons set forth above, the products Defendants sell bearing the Skullcandy Trademarks fail to adhere to the extensive and legitimate quality controls that Skullcandy exercises over products bearing the Skullcandy Trademarks to protect consumers from confusion and protect its brand goodwill.

92.     The products sold by Defendants are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

93.     Defendants' unauthorized sale of products bearing the Skullcandy Trademarks infringes on the Skullcandy Trademarks and diminishes their value.

94.     Because the products Defendants sell are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Skullcandy products.

95.     The products Defendants sell are also materially different from genuine Skullcandy products because they are not covered by the Skullcandy Warranty.

96.     Defendants' unauthorized sale of non-genuine products bearing the Skullcandy Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Skullcandy products when, in fact, they are not.

97.     Despite these facts, Defendants have sold, and continue to sell, products bearing the Skullcandy Trademarks through their Amazon storefront without Skullcandy's consent.

98.     Upon information and belief, Defendants, through their storefront, accept and fulfill orders from Utah residents for products bearing the Skullcandy Trademarks and ship products bearing the Skullcandy Trademarks to persons located in Utah.

**Skullcandy Has Attempted to Stop Defendants' Illegal Sale of Products Bearing the
Skullcandy Trademarks but Defendants Continue to Willfully Infringe
on the Skullcandy Trademarks**

99.     After Skullcandy discovered products bearing the Skullcandy Trademarks being illegally sold on the "Loop Savings" storefront, Skullcandy investigated the storefront to determine who was operating the storefront.  Through that investigation, Skullcandy identified Defendant Sterling as the operator of the Storefront.

100.     On or about November 28, 2018, counsel for Skullcandy sent Defendants a cease and desist letter, demanding that, to avoid a lawsuit, they immediately and permanently cease selling products bearing the Skullcandy Trademarks and identify the sources of their products.

101.     Defendants did not respond to this letter and continued to offer products bearing the Skullcandy Trademarks on the "Loop Savings" storefront.

102.     On or about April 26, 2019, counsel for Skullcandy sent Defendants another cease and desist letter, demanding that they immediately cease selling products bearing the Skullcandy Trademarks and identified other active lawsuits initiated by Skullcandy against unauthorized sellers.

103.     The April 26, 2019 letter specifically put Defendant Sterling on notice that the suit could be filed in Utah for continued sales, stating, "You should also be aware that, if you continue to ignore Skullcandy's demands and continue to sell Skullcandy Trademarked products unlawfully, you will be subject to personal jurisdiction in Utah where Skullcandy is located.  *See, e.g., Amini Innovation Corp. v. JS Imps., Inc.*, 497 F. Supp. 2d 1093, 1106 (C.D. Cal. 2007) (explaining that numerous courts have held that a defendant is subject to personal jurisdiction in the state where a plaintiff trademark owner is located if the defendant intentionally infringes the plaintiff's intellectual property while knowing where the plaintiff is located).  This letter serves as express notice to you that Skullcandy is located in Utah, your infringing sales harm Skullcandy, and that the effects of your unlawful actions are suffered in Utah where Skullcandy is located."

104.     Defendants again failed to respond to this letter and continue to offer products bearing the Skullcandy Trademarks through the Storefront.

105.    On or about May 3, 2019, counsel for Skullcandy sent another letter to Defendant Sterling.  This letter warned "**[I]f you wish to avoid escalated legal action, please immediately remove the Skullcandy product listings from your Amazon storefront and identify all sources of Skullcandy products you are selling or have sold in the past.**"  This letter also indicated that Defendants should institute a legal hold.

106.    Defendants again failed to respond to this letter and continue to offer products bearing the Skullcandy Trademarks through the Storefront.

107.    For the reasons discussed above, the products Defendants sell are not genuine Skullcandy products, are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and are materially different from genuine Skullcandy products.

108.    Particularly troubling is the sheer volume of Skullcandy products Defendants have sold in violation of the Skullcandy Trademarks in the thirty (30) days preceding the filing of the Complaint, Defendants have sold an estimated approximately 1,690 units and received an estimated $173,000 on these sales.

109.    By continuing to sell non-genuine products bearing the Skullcandy Trademarks, Defendants have interfered with Skullcandy's ability to exercise control over products being sold bearing the Skullcandy Trademarks.

110.    Through their sales of products bearing the Skullcandy Trademarks, Defendants have misled, and continue to mislead, consumers into believing that they are purchasing genuine Skullcandy products when, in fact, they are not.

111.    Defendants' actions infringe on the Skullcandy Trademarks and diminish their value.

112.    Further, Defendants' disregard of communications from Skullcandy and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

### Defendants Are Tortiously Interfering with Skullcandy's Agreements with Its Authorized Dealers

113.    Upon information and belief, Defendants have purchased Skullcandy products from Skullcandy Authorized Dealers for purposes of reselling them on the Internet.

114.    The Skullcandy Rules prohibit Skullcandy's Authorized Dealers from selling Skullcandy products to parties such as Defendants.  Specifically, the Skullcandy Rules prohibit Authorized Distributors from selling products to anyone except for Authorized Retailers.  The Skullcandy Rules prohibit Authorized Retailers from selling to anyone except for End Users.  Authorized Retailers are strictly prohibited from selling Skullcandy products to third parties who intend to resell the products.

115.    Defendants were informed of this prohibition by at least February 28, 2019.  Indeed, the cease and desist letter Skullcandy sent Defendants on February 28, 2019, informed Defendants that Skullcandy restricts the manner in which Authorized Dealers may sell Skullcandy products, and that Authorized Dealers may sell Skullcandy products only to End User customers through authorized channels and are specifically prohibited from selling products to resellers or any person or entity they know or have reason to know intends to resell the products.

102431141.2 0203478-00001

116.    Defendants were also informed that by purchasing Skullcandy products from an Authorized Dealer for purposes of resale, they were causing a breach of the agreement between Skullcandy and its Authorized Dealer and interfering with Skullcandy's agreements and business relationships.

117.    Defendants were also advised that if they continued to acquire Skullcandy products from Skullcandy's Authorized Dealers for purposes of resale, they would be liable for tortiously interfering with Skullcandy's contracts and/or business relationships.

118.    Despite being provided this information, Defendants have continued to acquire Skullcandy products from Skullcandy's Authorized Dealers.

119.    Upon information and belief, Defendants willfully and knowingly induced unknown Authorized Dealers to breach their agreements with Skullcandy so that they could acquire Skullcandy products and resell them.

**Skullcandy Has Suffered Significant Harm as a Result of Defendants' Conduct**

120.    As set forth above, the unauthorized sale of products bearing the Skullcandy Trademarks through unauthorized sellers, such as Defendants, has caused significant harm to the Skullcandy brand.

121.    When a consumer receives a poor quality, defective, counterfeit, or tampered-with product from Defendants, the consumer associates that negative experience with Skullcandy. Consequently, Defendants' ongoing sale of unauthorized products bearing the Skullcandy Trademarks harms the Skullcandy brand.

122.   Skullcandy has suffered and will continue to suffer significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

123.   Skullcandy has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights and brand integrity.

124.   Skullcandy is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell Skullcandy products, causing continued irreparable harm to Skullcandy's reputation, goodwill, relationships, intellectual property and brand integrity.

125.   Defendants' conduct was and is knowing, intentional, willful, malicious, wanton and contrary to law.

126.   Defendants' willful violations of the Skullcandy Trademarks and continued pattern of misconduct demonstrate intent to harm Skullcandy.

## <u>FIRST CAUSE OF ACTION</u>

### Trademark Infringement
### 15 U.S.C. §§ 1114 and 1125(a)(1)(a)

127.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

128.   Skullcandy is the owner of the Skullcandy Trademarks.

129.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

130.    The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

131.    Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in commerce for purposes of selling Skullcandy products on the Internet without the consent of Skullcandy.

132.    The products Defendants sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

133.    Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

134.    Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

135.    Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.  When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

136.    The products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

137.    The products Defendants sell bearing the Skullcandy Trademarks do not come with Skullcandy's Limited Warranty.

138.    Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

139.    Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

140.    Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

141.    Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to and abide by Skullcandy's quality controls, and come with the Limited Warranty, when, in fact, they do not.

142.    Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Skullcandy products when, in fact, they are not.

143.    Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Skullcandy when, in fact, they are not.

144.     Defendants' unauthorized use of the Skullcandy Trademarks has infringed upon and materially damaged the value of the Skullcandy Trademarks and caused significant damage to Skullcandy's business relationships.

145.     As a proximate result of Defendants' actions, Skullcandy has suffered, and continues to suffer, immediate and irreparable harm.  Skullcandy has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

146.     Skullcandy is entitled to recover its damages caused by Defendants' infringement of the Skullcandy Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

147.     Skullcandy is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Skullcandy will suffer irreparable harm.

148.     Skullcandy is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Skullcandy Trademarks.

## SECOND CAUSE OF ACTION

### Unfair Competition
### 15 U.S.C. § 1125(a)

149.     Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

150.     Skullcandy is the owner of the Skullcandy Trademarks.

151.    Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

152.    The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

153.    Defendants have willfully and knowingly used, and continue to use, the Skullcandy Trademarks in commerce for purposes of selling and advertising products bearing the Skullcandy Trademarks without the consent of Skullcandy.

154.    The products Defendants advertise and sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

155.    Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

156.    Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

157.    Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.  When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

158.    The products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

159.    The products Defendants advertise and sell bearing the Skullcandy Trademarks do not come with Skullcandy's Limited Warranty.

160.    Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

161.    Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

162.    Defendants' unauthorized advertisement and sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

163.    Defendants' use of the Skullcandy Trademarks in connection with their unauthorized sale and advertising of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to and abide by Skullcandy's quality control program, and come with the Limited Warranty and customer service benefits, when, in fact, they do not.

164.    Defendants' use of the Skullcandy Trademarks in connection with their unauthorized sale and advertising of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Skullcandy products when, in fact, they are not.

-34-

165.    Defendants' use of the Skullcandy Trademarks in connection with their unauthorized sale and advertising of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored by, authorized by, approved by, or otherwise connected with Skullcandy when, in fact, they are not.

166.    Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising infringes on the Skullcandy Trademarks.

167.    Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising has materially damaged the value of the Skullcandy Trademarks and has caused significant damages to Skullcandy's business relations.

168.    As a proximate result of Defendants' actions, Skullcandy has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial

169.    Skullcandy is entitled to recover their damages caused by Defendants' infringement of the Skullcandy Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

170.    Skullcandy is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Skullcandy will suffer irreparable harm.

171.    Skullcandy is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Skullcandy Trademarks.

### THIRD CAUSE OF ACTION

### Common Law Trademark Infringement

172.    Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

173.    This claim arises under the laws of the State of Utah.

174.    Skullcandy is the owner of the Skullcandy Trademarks.

175.    Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

176.    The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

177.    The Skullcandy Trademarks are distinctive and widely recognized by the consuming public.   Skullcandy products are sold and purchased through Skullcandy's Authorized Dealers throughout the United States, including Utah.

178.    Skullcandy is widely recognized as the designated source of goods bearing the Skullcandy Trademarks.

179.    Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in interstate commerce for the purpose of selling products bearing the Skullcandy Trademarks without Skullcandy's consent.

180.    The products Defendants sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

181.    Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

182.    Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

183.    Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.  When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

184.    The products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

185.    The products Defendants sell bearing the Skullcandy Trademarks do not come with the Limited Warranty.

186.    Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

187.    Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service

-37-

requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

188.    Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

189.    Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to and abide by Skullcandy's quality controls, and come with the Limited Warranty and customer service benefits, when, in fact, they do not.

190.    Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Skullcandy products when, in fact, they are not.

191.    Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Skullcandy when, in fact, they are not.

192.    Defendants' knowing and willful use of the Skullcandy Trademarks in connection with the unauthorized and illegal sale of products bearing the Skullcandy Trademarks without Skullcandy's consent infringes on the Skullcandy Trademarks and is contrary to honest practice in industrial and commercial matters.

193.    Defendants' unlawful actions and unauthorized use of the Skullcandy Trademarks has materially damaged the value of the Skullcandy Trademarks, caused significant damage to Skullcandy's business relations, and infringed on the Skullcandy Trademarks.

194.    As a proximate result of Defendants' actions, Skullcandy has suffered, and will continue to suffer, irreparable harm, as well as damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

195.    Skullcandy is entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

## FOURTH CAUSE OF ACTION

**Deceptive Trade Practices**
**Utah Code Ann. § 13-11a-3**

196.    Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

197.    This claim arises under the laws of the State of Utah.

198.    Skullcandy is the owner of the Skullcandy Trademarks.

199.    Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

200.    The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

201.    Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in interstate commerce, including through their product listings on Amazon, for

purposes of advertising, promoting, and selling Skullcandy products on the Internet without Skullcandy's consent.

202.    Defendants' advertisements and promotions of products unlawfully using the Skullcandy Trademarks have been disseminated to the relevant purchasing public.

203.    The products Defendants advertise and sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

204.    Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

205.    Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

206.    Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them.  When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

207.    The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

208.    The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks do not come with the Limited Warranty.

209.    Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls

and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

210.   Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

211.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

212.   Defendants' use of the Skullcandy Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of Skullcandy products because it suggests that the products Defendants offer for sale originate from, or are sponsored, authorized, approved, or otherwise connected with Skullcandy when, in fact, they are not.

213.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks, and unauthorized use of the Skullcandy Trademarks in advertising constitute deceptive trade practices under Utah Code Ann. § 13-11a-3.

214.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks, and unauthorized use of the Skullcandy Trademarks in advertising materially damages the value of the Skullcandy Trademarks and causes significant damages to Skullcandy's business relations.

215.    As a result of Defendants' unlawful actions, Skullcandy has suffered, and continues to suffer, immediate and irreparable harm.  Skullcandy has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

216.    Pursuant to Utah Code Ann. § 13-11a-4(2), Skullcandy is entitled to injunctive relief enjoining Defendants' infringing conduct, as well as damages, and attorneys' fees and costs.

217.    Skullcandy is also entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

### FIFTH CAUSE OF ACTION

**Unfair Competition**
**Utah Code Ann. § 13-5a-102**

218.    Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

219.    This claim arises under the laws of the State of Utah.

220.    Skullcandy is the owner of the Skullcandy Trademarks.

221.    Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

222.    The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

223.    Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in interstate commerce, including through their product listings on Amazon, for the

purpose of advertising promoting, and selling products bearing the Skullcandy Trademarks without the consent of Skullcandy.

224. Defendants' advertisements and promotions of products unlawfully using the Skullcandy Trademarks have been disseminated to the relevant purchasing public.

225. The products Defendants advertise and sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

226. Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

227. Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

228. The products Defendants advertise, promote, and sell are not genuine Skullcandy products because the products are not authorized for sale by Skullcandy and are materially different from genuine Skullcandy products.

229. Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

230. The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

-43-

231.   The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks do not come with the Limited Warranty.

232.   Because the products Defendants advertise and sell bearing the Skullcandy are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

233.   Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

234.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

235.   Defendants' use of the Skullcandy Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of Skullcandy products because it suggests that the products Defendants offer for sale originate from, or are sponsored, authorized, approved, or otherwise connected with Skullcandy when, in fact, they are not.

236.   Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising infringes on the Skullcandy Trademarks.

-44-

237.    Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising has materially damaged the value of the Skullcandy Trademarks and has caused significant damages to Skullcandy's business relations.

238.    Defendants' unauthorized sale of products bearing the Skullcandy Trademarks, and unauthorized use of the Skullcandy Trademarks in advertising constitute unfair competition under Utah Code Ann. § 13-5a-102.

239.    As a result of Defendants' unlawful actions, Skullcandy has suffered, and continues to suffer, irreparable harm.  Skullcandy has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

240.    Pursuant to Utah Code Ann. § 13-5a-103(1), Skullcandy is entitled to actual damages, punitive damages, and attorneys' fees and costs.

241.    Skullcandy is also entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

## SIXTH CAUSE OF ACTION

### Tortious Interference with Contract and Business Relations

242.    Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

243.    Skullcandy has entered into agreements with Authorized Dealers to sell Skullcandy products.   These agreements and the Skullcandy Rules specifically prohibit

Skullcandy's Authorized Dealers from selling Skullcandy products to third parties, such as Defendants, for purposes of resale.

244.    Defendants knew that Skullcandy's agreements with its Authorized Dealers prohibit Skullcandy's Authorized Dealers from selling Skullcandy products to third parties, such as Defendants, for purposes of resale.

245.    Defendants were provided notice of this prohibition by at least February 28, 2019, through the cease and desist letter they received from Skullcandy.

246.    Despite having knowledge of this prohibition, Defendants knowingly and willfully interfered with the Skullcandy Rules and the agreements between Skullcandy and its Authorized Dealers by inducing Skullcandy's Authorized Dealers to breach their agreements and sell product to Defendants so they could resell them on the Internet.

247.    Defendants acted with a wrongful purpose by acquiring Skullcandy products from Authorized Dealers for the purpose of reselling those products on the Internet in violation of the Skullcandy Rules and Skullcandy's agreements with its Authorized Dealers.

248.    Defendants' actions have caused injury to Skullcandy for which Skullcandy is entitled to compensatory damages in an amount to be proven at trial.

249.    Skullcandy is entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

## **PRAYER FOR RELIEF**

WHEREFORE, Skullcandy prays for relief and judgment as follows:

A.      Judgment in favor of Skullcandy and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.      That a preliminary and permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

      i)      Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Skullcandy products;

      ii)     Prohibiting the Enjoined Parties from using any of the Skullcandy Trademarks in any manner, including advertising on the Internet;

      iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Skullcandy products as well as any products bearing any of the Skullcandy Trademarks;

      iv)    Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Skullcandy Trademarks, including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales

receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)     Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Skullcandy's products, or any of the Skullcandy Trademarks;

vi)    Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Skullcandy Trademarks which associate Skullcandy's products or the Skullcandy Trademarks with the Enjoined Parties or the Enjoined Parties' website;

vii)   Requiring the Enjoined Parties to take all action to remove unauthorized Skullcandy Trademarks from the Internet, including from www.amazon.com;

C.     An award of attorneys' fees, costs, and expenses; and

D.     Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.


Date: June 20, 2019                                     */s/ Monica S. Call*
                                                        Monica S. Call

                                                        *Attorneys for Skullcandy, Inc.*